UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DAWN FRAZIER, | : | Case No. 1:15-cv-427 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| AK STEEL CORPORATION, | : | |
| Defendant. | : | |

**ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Doc. 9)**

This civil action is before the Court on Defendant's motion for summary judgment (Doc. 9), and the parties' responsive memoranda (Docs. 16, 19).

### I.  BACKGROUND FACTS

Plaintiff worked for Defendant AK Steel Corporation from September 8, 2014 to November 20, 2014.  Shortly after she was hired, her co-worker, Bob Rogers, showed her a photo of his penis during work hours.  Plaintiff maintains that because she was a relatively new hire and was afraid to "rock the boat," she let it go without involving anyone else at AK Steel.  However, AK Steel became aware of the situation and as a result of the subsequent investigation, both Mr. Rogers and Plaintiff were terminated.

Plaintiff alleges that she was retaliated against after opposing the sexual harassment and participating in AK Steel's investigation.

## II. UNDISPUTED FACTS[1]

1. AK Steel is a steel manufacturer with plants located throughout Indiana, Kentucky, Michigan, Ohio, and Pennsylvania. (Doc. 10 at ¶ 22).

2. AK Steel hired Dawn Frazier to work as an hourly production employee in its Middletown, Ohio plant on September 8, 2014. (Doc. 1 at ¶ 7).

3. Hourly production and maintenance employees at the Middletown Works plant are represented by the International Association of Machinists and Aerospace Workers, AFLCIO, Local Lodge 1943, and the terms and conditions of their employment are governed by a collective bargaining agreement, or CBA. (Doc. 10 at ¶ 18).

4. As a new hire, Frazier was considered a probationary employee for her first 1040 hours of actual work. (Doc. 11 at 20; Doc. 10, Ex. 1).

5. During her new employee orientation, Frazier received and reviewed several AK Steel employment policies, including AK Steel's Equal Employment Opportunity Policy and its Harassment and Workplace Violence Policy. (Doc. 15 at 45-46, 130).

6. From the outset of her employment, Frazier knew that these policies specifically state that sexual harassment is not tolerated in the workplace and violators are subject to appropriate discipline. (Doc. 15 at 128).

7. Frazier understood that the Harassment and Workplace Violence Policy prohibits sexual references or suggestive comments about a person's body, appearance, or clothing; or the display of pictures or objects that have women or men as sexual objects. (Doc. 15 at 134).

8. Frazier knew that under this policy, "each matter that is reported will be investigated and, where appropriate, corrective action, up to and including termination of the offending individual's employment will be taken." (Doc. 15 at 135, Exs. 5, 6).

9. Frazier was well aware that the Harassment and Workplace Violence Policy also prohibits retaliation against individuals who in good faith report harassment, cooperate in any investigation, or reject sexual advances. (Doc. 15 at 132).

---

[1] *See* Doc. 9-1 and Doc. 16-1.

10. After completing orientation, Frazier began her employment with AK Steel as a crane operator trainee. (Doc. 15 at 51).

11. Frazier began her in-cab training on the gantry crane, which uses magnets to lift massive steel slabs from the facility's floor to an adjacent conveyor belt. (Doc. 15 at 51-52).

12. The steel slabs are extremely heavy and moving the slabs can be dangerous. (Doc. 15 at 52).

13. Crane operators must maintain keen focus while operating the crane to avoid causing a serious injury to themselves or others. (Doc. 15 at 53).

14. AK Steel is committed to safety and requires that all crane operators actively participate in a series of crane training safety courses. (Doc. 15 at 55-56).

15. Frazier participated in an intensive, mandatory crane training course during her second and third weeks at AK Steel. (Doc. 15 at 53, 55-56).

16. The two-week training course included both classroom and in-crane sessions. (Doc. 15 at 56).

17. These crane training courses were taught by two hourly crane trainers, Tim Cox and Darren Retherford. (Doc. 15 at 56).

18. After this two-week intensive crane training, trainees like Frazier were paired with other crane operators to perform daily in-cab crane training until the trainee was capable of operating the crane on his or her own. (Doc. 15 at 47, 63-64).

19. Sometime in November 2014, an hourly AK Steel employee named Lynn Townsend heard a rumor that crane operator Bob Rogers, a regular hourly employee, showed Frazier a picture of a penis on his cell phone while Rogers was training Frazier in a crane. (Doc. 11 at 14-15).

20. On November 14, 2014, Townsend told Shift Manager Rich Greene about the rumor and Greene contacted Section Manager Dennis Keenan. (Doc. 11 at 14-15).

21. Keenan approached Frazier and asked if she had any trouble with Rogers. (Doc. 15 at 110-111).

22. Frazier initially denied any problems with Rogers, but Keenan pressed the issue, and Frazier eventually admitted that Rogers did show her the inappropriate picture.  (Doc. 15 at 112).

23. Dennis Keenan contacted Labor Relations to investigate the incident involving Bob Rogers allegedly showing a picture of a penis to Dawn Frazier.  (Doc. 11 at 14).

24. On November 14, 2014, Senior Labor Relations Representative Jessica Morris, along with Keenan and Department Manager Dale Rupp, met with Frazier to discuss what happened in the crane with Bob Rogers.  (Doc. 15 at 113).

25. Frazier acknowledged that Rogers showed her an image of a penis on his cell phone.  (Doc. 15 at 114).

26. Frazier told Morris that she and Rogers would share memes with each other that they had found online, and while some of these memes may have been of a sexual nature, she felt Rogers "crossed the line" when he showed her a picture of a penis.  (Doc. 10 at ¶ 14).

27. Morris did not know what a "meme" was, and when she asked Frazier to describe a meme, Frazier scrolled through her phone, before ultimately showing Morris a meme describing being a "good wife."  (Doc. 10 at ¶¶ 15-16).

28. Given Frazier's confirmation that Rogers showed her a picture of a penis, pursuant to the CBA procedures for regular employees, AK Steel suspended Rogers from work pending an investigation.  (Doc. 11 at 20).

29. AK Steel ultimately concluded through its investigation that Rogers did, in fact, show Frazier the offensive picture at work.  (Doc. 11 at 22).

30. AK Steel terminated Rogers' employment for violating AK Steel's Harassment and Workplace Violence Policy.  (Doc. 11 at 22).

31. In the course of Morris's investigation, Morris spoke to crane trainers Tim Cox and Darren Retherford.  (Doc. 11 at 22).

32. Cox told Morris that he had to repeatedly stop the crane training classes and redirect the group because Frazier made several sexually charged jokes and comments.  (Doc. 14 at 14).

33. For example, Frazier used the term "cuddle buddy." (Doc. 14 at 22).

34. During a training class, Retherford, Cox, Frazier and a few other employees were talking when Retherford mentioned that he had a tattoo on his upper shoulder. (Doc. 15 at 79).

35. Frazier acknowledges that everyone who has seen her tattoo believes it has a sexual meaning. (Doc. 15 at 80).

36. During Morris's investigation, Morris learned that sometime after Frazier's two week crane training sessions, Frazier and other employees were seated in the break room. (Doc. 11 at 31; Doc. 15 at 81- 82).

37. An employee named Joey Hollon walked into the break room. (Doc. 11 at 31).

38. As Hollon walked into the room, someone said, "There's that c*cksucker," referring to Hollon. (Doc. 11 at 31; Doc. 15 at 81).

39. Morris made the decision to terminate Frazier's employment because multiple witness accounts confirmed Frazier's repeated violations of AK Steel's Harassment and Workplace Violence Policy during her short tenure with AK Steel. (Doc. 11 at 24).[2]

40. Morris met with Frazier on November 20, 2014 to advise Frazier of the decision to terminate her employment. (Doc. 11 at 25-26).

41. Morris told Frazier that her employment was being terminated because she had failed to satisfactorily complete her probationary period. (Doc. 11 at 25-26).

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[2] Plaintiff admits that Morris alleges this was her reasoning for her termination, but does not admit that this reasoning was legitimate or the true reason.

242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS

To prove a *prima facie* case of retaliation, Plaintiff must demonstrate that: (1) she engaged in a protected activity under Title VII; (2) defendants were aware of the activity; (3) plaintiff was subject to an adverse employment action; and (4) there was a causal nexus between plaintiff's protected activity and the adverse employment action. *Donald v. Sybra, Inc.,* 667 F.3d 757, 761 (6th Cir. 2012).[3]

### A. *Prima facie* case

Defendant does not dispute that Plaintiff satisfies the first three elements of her *prima facie* case. Therefore, Plaintiff must only prove that a causal connection exists between her engaging in protected activity (opposing sexual harassment and participating

---

[3] Plaintiff brings claims for retaliation pursuant to Title VII of the Civil Rights Act of 1964 and Ohio Revised Code Section 4112.02. Because federal and state law retaliation claims are governed by the same standards, the claims will be considered together. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 541-42 (6th Cir. 2003).

6

in Defendant's investigation into the sexual harassment) and the adverse employment action.

To establish a causal connection, a plaintiff must produce sufficient evidence for one to infer that the defendant would not have taken the adverse employment action had the plaintiff not engaged in the protected activity. *Barrett v. Lucent Tech., Inc.*, 36 F. App'x 835 (6th Cir. 2002). Relevant factors to consider when determining causation include evidence that the employer treated the plaintiff differently than similarly situated employees, or that the adverse action was taken shortly after the plaintiff's exercise of protected rights. *Moon v. Transport Drivers, Inc*., 836 F.2d 226, 230 (6th Cir. 1987).

The facts in this case are unique, because Plaintiff never complained about sexual harassment. However, when she was confronted with the issue, she admitted that she had been sexually harassed and participated in AK Steel's investigation. Jessica Morris interviewed Plaintiff on November 14, 2014 about the sexual harassment incident with Bob Rogers. (Doc. 11 at 15). Morris removed Plaintiff from the work schedule on November 18, 2014, just four days later. (Doc. 18, Ex. B). On November 20, 2014, Ms. Morris terminated Plaintiff. (Doc. 11 at 21). Plaintiff argues that a period of six days between the protected activity and adverse employment action is more than enough to establish a causal connection.

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a

7

prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding temporal proximity to be sufficient evidence of causation where termination occurred on the same day the employer learned of the protected conduct. *See also Williams v. Zurz*, No. 10-4161, 2012 U.S. App. LEXIS 22604, at *14-15 (6th Cir. 2012). Accordingly, given the facts of this case, temporal proximity alone (six days between the protected activity and the adverse employment action) is sufficient to establish a *prima facie* case of retaliation.

### B. Legitimate Non-Discriminatory Reason

Now, the burden of proof shifts back to the Defendant to offer a legitimate non-discriminatory reason for the adverse employment action. *Weigel v. Baptist Hosp.*, 302 F.3d 367, 377-78 (6th Cir. 2002). The burden on the defendant at this stage of the *McDonnell Douglas* analysis is not to prove the existence of a nondiscriminatory reason for the adverse employment action. Rather, "[t]his burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

Defendant claims that Plaintiff was terminated because she repeatedly violated AK Steel's Harassment and Workplace Violence policy and engaged in a "pattern of offensive and inappropriate conduct from the time she was hired." (Doc. 9 at 6, ¶ 1). Specifically, AK steel alleges that:

- Frazier told Morris that she shared online memes with a co-worker, and some of these memes may have been of a sexual nature. (Doc. 10 at ¶ 14).

8

- Cox told Morris that Frazier engaged in a lot of sexual talk at work.  (Doc. 14 at 30).

- Cox told Morris that he had to repeatedly stop the crane training classes and redirect the group because Frazier made several sexually charged jokes and comments.  (Doc. 14 at 14).

- Cox told Morris that he never before had to interrupt a training session because of an employee's behavior, but Frazier's comments were the most offensive Cox had heard in his 33 years at AK Steel.  (Doc. 14 at 31).

- Cox told Morris that Frazier said she was looking for a "cuddle buddy."  (Doc. 14 at 22).

- Cox and Retherford told Morris that Frazier said she wanted to take a shower with some of her male-coworkers.  (Doc. 10 at ¶ 8).

- Cox and Retherford told Morris that Frazier had engaged in a pattern of offensive and inappropriate conduct from the time she was hired.  (Doc. 14 at 31; Doc. 13 at 10).

- Retherford and Cox told Morris that Frazier lifted the back of her shirt during a training class and showed everyone a tattoo above her buttocks that read "Give it Hell."  (Doc. 14 at 21-25).

- Retherford told Morris that he heard Frazier routinely use sexually suggestive language during the crane training course.  (Doc. 10 at ¶ 9).

- Retherford told Morris that Frazier's offensive language and obsession with talking about sex made Retherford so uncomfortable that he always took another employee with him when he evaluated Frazier's progress because he did not want to be alone with her at work.  (Doc. 13 at 14).

- Joey Hollon told Morris that Frazier asked coworkers in a breakroom, "What's wrong with sucking c*ck?"  (Doc. 12 at 31; Doc. 10 at ¶ 12).

However, Defendant's investigation which uncovered these alleged violations was prompted by Plaintiff admitting that she was sexually harassed.  There is no evidence that AK Steel would have learned about any of these allegations had Plaintiff not been

9

truthful in admitting that she was sexually harassed. Accordingly, the Court cannot find, as a matter of law, that AK Steel's legitimate reason is in fact non-discriminatory. *See, e.g., Burt v. Maple Knoll Communities, Inc.*, No. 1:15cv225, 2016 U.S. Dist. LEXIS 93865, at *25-26 (S.D. Ohio July 19, 2016).

### C. Pretext

Assuming, *arguendo*, that AK Steel established a legitimate non-discriminatory reason for Plaintiff's termination, the burden of production shifts back to Plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Plaintiff may establish that a proffered reason is a mere pretext by showing that: (1) the stated reason had no basis in fact; (2) the stated reason was not the actual reason; or (3) the stated reason was insufficient to explain defendant's action. *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir. 1998). The pretext inquiry evaluates whether the legitimate business reasons offered by the defendant were not its true reasons, but rather were a pretext for discrimination. *Burdine*, 450 U.S. at 253. A plaintiff can create an issue of material fact on pretext with proof of inconsistent statements. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) (conflicting testimony regarding reasons for plaintiff's dismissal creates jury issue regarding pretext).

Allegations that Plaintiff engaged in a pattern of offensive and inappropriate conduct were never raised until Plaintiff engaged in protected conduct by admitting that

Rogers showed her a picture of his penis. Thereafter, Ms. Morris elicited complaints from AK Steel employees:

- Defendant claims that Retherford was so offended by Plaintiff's conduct that he was afraid to be alone with her. (Doc. 13 at 10, 11; Doc. 11 at 29). However, Retherford never reported Plaintiff's alleged offensive conduct to anyone.[4]

- Defendant alleges that on one occasion, Retherford, Cox, and a few other employees were talking when Retherford mentioned he had a tattoo on his upper shoulder. (Doc. 9 at 7, ¶ 2). Defendant alleges that Plaintiff then lifted up the back of her shirt to show Retherford and the other employees her tattoo. (*Id.*) While Defendants' Position Statement to the EEOC states that Retherford and Cox were "extremely uncomfortable" after witnessing her "provocative display" (Doc. 16, Ex. C at 4), Retherford allegedly pulled down his shirt to show the group the tattoo on the back of his shoulder (Doc. 13 at 12; Doc. 15 at 78). In fact, Retherford joked with Fraizer that some part of the tattoo looked like it had a penis on it. (Doc. 15 at 79). Only then did Plaintiff respond by showing the group her tattoo located near her lower back, raising her shirt about three inches. (*Id.*) Despite Defendant's contention that Retherford was terribly offended by Fraizer's conduct during this conversation, Retherford admitted he was not offended at all. (Doc. 13 at 12-13). Furthermore, Cox admitted that he did not even witness this exchange. (Doc. 14 at 17).

- Ms. Morris initially interviewed Cox and Retherford on November 19, 2014 and asked them if Fraizer talked inappropriately at work. (Doc. 16, Ex. D). Cox and Retherford responded yes, but not toward them, just "mill humor." (*Id.*; Doc. 14 at 12). In fact, Cox acknowledged the work environment in the mill at AK Steel generally was an environment where "people have a tendency to say some things that probably would not be appropriate if you heard them on the street." (Doc. 14 at 13). Cox acknowledged that the mill environment is different than a more professional environment, like a doctor's office for example. (*Id.*) It is only after Retherford and Cox became involved with this case, that they claimed Plaintiff's conduct was particularly egregious.

---

[4] Retherford and Plaintiff were friends outside of work. (Doc. 15 at 61). In fact, Retherford and Fraizer spoke on the phone outside of work on ten separate occasions from October 2014 to December 2014, some of those calls lasting over twenty minutes. (Doc. 16, Ex. A). Seven of those calls were initiated by Mr. Retherford. (*Id.*) Retherforld even placed calls to Plaintiff after she was terminated to see if she was okay and to ask her what happened. (Doc. 13 at 15; Doc. 15 at 62).

- Defendant alleges that Cox told Morris that Fraizer made comments during the crane training class during the first week of her employment that made other trainees uncomfortable. (Doc. 9 at 6, ¶ 3; Doc. 14 at 14). When questioned about who specifically felt uncomfortable, Cox said "pretty much everybody." (*Id.*) However, Cox did not receive a single complaint about Fraizer's behavior from any of the trainees in the class, nor could he identify who they were. (*Id.* at 15-16).

- During one of the crane training classes, one of the participants asked Fraizer if she was single and she responded that she was. (Doc. 15 at 67). Fraizer was then asked if she was looking for anyone specifically and she said, "No, but it would be nice to have a cuddle buddy." (*Id.*) Fraizer only mentioned the term "cuddle buddy" in response to a question.

- Despite saying Fraizer's conduct was the "worst he ever heard in his 33 years at AK Steel," Cox fails to offer any explanation why. When asked if the "cuddle buddy" comment was the most offensive thing he had heard in his 33 years at AK Steel he replied "not specifically that comment, no." (Doc. 14 at 31). When asked if her tattoo was the most offensive thing he had seen in his 33 years, he replied, "it was pretty offensive, just the way it came about." (*Id.*) However, Cox admitted that he was not present when Fraizer showed her tattoo. If Fraizer's conduct was truly the most egregious he encountered during his 33 years at AK Steel, it is remarkable that he cannot give any examples, made no complaints about Fraizer, and never received any complaints about Fraizer.

- Defendant also alleges that Fraizer made a comment about wanting to take a shower with some of her male co-workers. Toward the end of her crane training, Fraizer, Retherford, Cox, Brandon, and Kaleb were taking a tour of the facility. (Doc. 15 at 68). The men were discussing "how they compare each others-for lack of a better word-genitalia in the shower and how they take showers together and flip each other with towels and they're joking…" (*Id.* at 68). Fraizer knew the men were just joking and probably did not actually do this. (*Id.* at 69). Fraizer responded to their comments with the statement that she was jealous she did not get to shower at work. (*Id.* at 68).

Based on this conflicting evidence, a reasonable juror could find that Defendant's reasoning for terminating Plaintiff is pretextual, because it is based on inconsistent statements and manipulation of the facts.

12

Furthermore, under the "honest belief" rule, the burden is on the employer to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006). The key inquiry is whether the employer made reasonably informed and considered decision before taking an adverse employment action. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012). For an employer to avoid a finding that its claimed nondiscriminatory reason was pretexutal, the employer "must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998). The Sixth Circuit has explained:

> In determining whether an employer "reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). Although we will not "micro-manage the process used by employers in making their employment decision," we will also not "blindly assume that an employer's description of its reasons is honest." *Id.* Therefore, "when the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id.* at 807-08.

Here, there is absolutely no evidence that anyone made any complaints about Plaintiff's behavior until after she admitted to having been sexually harassed. This fact is in stark

13

contrast to the conflicting allegations about her conduct being the "worst [Defendant] had ever seen in 33 years at AK Steel." Accordingly, it is not unreasonable to find that Defendant should have, at the very least, interviewed the Plaintiff in order to make a reasonably informed and considered decision. Morris admits that she never interviewed Plaintiff about the allegations of inappropriate and sexual conduct. (Doc. 11 at 21). Therefore, a reasonable juror could find that the investigation done by Defendant was not performed in good faith, was not reasonable, and was purely pretextual so that Defendant could justify the termination.

There are numerous disputed issues of fact in this case, including the discrepancies in the statements made by AK Steel employees during the investigation, that call into question the legitimacy of Defendant's proffered reason for terminating Plaintiff. The Court cannot find, as a matter of law, that AK Steel made a reasonably informed and considered decision before terminating Plaintiff. A jury could reasonably find that the rationale offered by AK Steel either had no basis in fact, did not actually motivate its decision, or was insufficient to warrant the challenged conduct. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 241 (6th Cir. 2015).

## V. CONCLUSION

Accordingly, for these reasons, Defendant's motion for summary judgment (Doc. 9) is **DENIED**.

**IT IS SO ORDERED**.

Date:  11/8/16                                                                                       *s/ Timothy S. Black*
                                                                                                       Timothy S. Black
                                                                                                       United States District Judge